IN THE MATTER OF THE ESTATE OF
RAYMOND W. ELLIS, DECEASED.

*New Castle, May* 16, 1939.

*Charles F. Richards,* for petitioner Wilmington Trust Co., Executor of Raymond W. Ellis, deceased.

*John J. Morris, Jr.,* of the firm of Hering, Morris, James and Hitchens, and *Thomas H. Wingate,* for respondents Raymond W. Ellis, Jr., William L. Ellis and Olive D. Ellis, guardian of Charles H. Ellis.

*Harry W. Lunger,* for respondent Wilmington Trust Co.

*Robert H. Richards,* for respondents Glenden Land Co. and Wilmington Trust Co., executor of Mary A. B. duPont Laird, deceased.

*Caleb S. Layton,* for respondent Henry B. duPont.

*William S. Potter,* of the firm of Southerland, Berl, Potter & Leahy, for respondent Eugene E. duPont.

SPEAKMAN, Judge, delivering the opinion of the court:

The petitions in this proceeding were filed under the provisions of *Section* 3837 of the *Revised Code of* 1935. This section was amended by *Chapter* 191, *Volume* 41, *Laws of Delaware,* approved May 19, 1937, by including in the classification of claims "Fourth: Taxes imposed by the State of Delaware." By this amendment classes "Fourth to Ninth," inclusive, as published in said section of the Code, appear as classes "Fifth to Tenth," inclusive, in said amendment, but otherwise the order of payment of claims was not changed by the amendment. The amendment was approved subsequent to the death of the decedent and therefore is not pertinent to the consideration of this proceeding, and for said reasons the section will be considered as it appears in the Code, that is, without the amendment.

At a hearing in this proceeding the attorney for Raymond W. Ellis, Jr., William W. Ellis and Olive D. Ellis, guardian of Charles H. Ellis, hereinafter referred to as the Ellis children, proposed to call witnesses in support of the allegations contained in their respective answers to the amended petition.

He contended that the Ellis children had the right, and if permitted they would show by the testimony of witnesses that with respect to their claims there existed between their father and them during his lifetime the relation of *quasi* guardian, or guardian *de son tort,* and wards by reason of the father without legal appointment or qualification having assumed the functions of guardian by exercising control over the funds which represent their claims, and as a result thereof the father at the time of his death was subject to all the responsibilities that attach to a legally constituted guardian, and he directed attention to *Section* 4432 of the *Revis-*

*ed Code of* 1935, which provides that: "The Orphans' Court may order that any property in the guardian's possession, as such, at the close of the guardianship, shall be delivered to the ward, or his representatives, and enforce obedience to such order"; and claimed that by reason of the jurisdiction of this court over the property of minors it had jurisdiction in these proceedings to hear and determine whether the funds, representing the claims of the Ellis children, were held in trust for them by the decedent at the time of his death.

This offer was objected to by the attorneys for the respondents, Wilmington Trust Company, executor of Mary A. B. duPont Laird, deceased, and Henry B. duPont, on the ground that the jurisdiction of this court in this proceeding was confined to the giving of instructions to the executor with respect to preferences in the payment of creditors claims with respect of which the petitioner asked the aid of this court.

It was argued at great length on behalf of the Ellis children that because this court has jurisdiction to determine the order in which the claims of the several respondents should be paid, it could also in this proceeding exercise the express powers granted to it by said *Section* 4432 of the said *Code,* relative to the settlement of guardian accounts, as well as all general equity powers necessary or incident to a final and complete adjudication of the rights of the respective parties.

In his argument on the admissibility of evidence in support of the answers of the Ellis children to the amended petition, counsel for the Ellis children, after first stating their three proofs of claim, as filed with the executor, were identical, except as to the names of the claimants, the dates of the transactions mentioned therein, and the amounts thereof, set out in his brief what he termed the material parts of the proof of claim filed on behalf of Charles H. Ellis, as follows:

"Personally appeared before me, the Subscriber, a Notary Public for the State and County aforesaid, Olive D. Ellis of Wilmington, Delaware, and made solemn oath and said that she is the Guardian duly appointed by the Orphans' Court, in and for New Castle County of Charles H. Ellis, a minor and a son of herself and Raymond W. Ellis, deceased; that attached hereto is a note dated September 5, 1930, whereby the said Raymond W. Ellis promised to pay on demand to the said Charles H. Ellis the sum of Twenty-two thousand six hundred ninety-four dollars and nineteen cents ($22,694.19) with interest thereon at five percentum (5%) per annum; that the consideration for the said note was as follows:

"On September 5, 1930, the said Raymond W. Ellis having authority so to do, closed out an account owned by and in the name of the said Charles H. Ellis with the firm of Laird, Bissell & Meeds, Wilmington, Delaware, and received therefrom the sum of Twenty-two thousand six hundred ninety-four dollars and nineteen cents ($22,694.19); that the assets in the said account prior to and on the day of such withdrawal were the absolute property of the said Charles H. Ellis, the amounts of cash at any time paid into the said account having been owned by the said minor, and having been derived as follows, to wit:

"A savings account in the name of the said Charles H. Ellis, in Wilmington Trust Company, and a $500.00 legacy to him from the estate of Benjamin Ellis, his grandfather; that at the said date the said Raymond W. Ellis told this affiant and the said Charles H. Ellis of the said closing out and receipt of funds, and then and there informed them that he would secure the said amount to the said Charles H. Ellis in the form of his promissory note;" and he stated that in the proof of claim as filed, the transactions between the deceased and his sons which gave rise to the claims are recited fully.

But even if this is so, reference to the statement of counsel for the Ellis children, taken in connection with the material parts of the proof of claim of Charles H. Ellis as above set out, disclosed that the claims of the Ellis children were represented by promissory notes and that the respective recitals of the transactions which gave rise to their claims were specifically stated to be the considerations for the notes.

The jurisdiction given to this court under said *Section* 3837 is a special statutory jurisdiction, limited in its nature and available only to an executor or administrator who is

unable to determine "between two or more creditors, the order of preference to be given to their respective demands."

The section under consideration contains no language which would warrant the assumption that the Legislature intended that this court was to be given jurisdiction to inquire into and determine controversies of either a legal or equitable nature between an executor or administrator and those holding claims against a decedent's estate.

In a proceeding under the section the only controversy that could arise is between the creditors touching the order of payment of their respective demands. As between a personal representative and creditors this court is not authorized to go outside of the petition for the purpose of determining the character of the demands of the respective creditors.

In this proceeding it conclusively appeared that the claims of the Ellis children are on promissory notes. They were filed as such and were so accepted by the executor, as is shown by both its original and amended petitions. It did not appear that the Ellis children had withdrawn or abandoned their proofs of claim on the notes or that they expected to do so, therefore the proofs of claim must be considered in the form in which they were filed with the executor, as shown by its petition.

If any doubt remained in my mind that they should be otherwise considered, that doubt was entirely removed by the contention of counsel for the Ellis children that he should be permitted in this proceeding to convert claims upon notes, the collection of which would be enforceable in a court of law, into claims to impress trusts on funds in the hands of the executor, for which purpose resort must be had to a court of equity, without having presented the claims in the later form to the executor with the affidavits required by *Section* 3841 of said *Code*, to the effect that nothing had been paid or delivered toward the satisfaction of said claims, and that

the sums demanded were justly and truly due, so as to give to the executor the right to exercise the opportunity to reject the claims in such form under the provisions of *Section* 3861 of said *Code*, if it desired to do so. It was clear, that without the consent of the executor, a substitution of one claim for another of an entirely different character could not be considered by this court, under the authority contained in said *Section* 3837.

It was my opinion that this court had neither the equitable jurisdiction or power to hear and determine any controversy between the Ellis children and the executor touching the merits of their claims as set out by their respective answers, and for that reason at an adjourned hearing in this proceeding the objection of counsel for Mary A. B. duPont Laird's executor and Henry B. duPont to said offer of evidence was sustained.

There is no difficulty in determining the order of preference of the claims of the Ellis children and Glenden Land Company. They are evidenced by promissory notes signed, but not sealed, by the petitioner's testator during his lifetime. There is nothing unusual in their form. They are clearly contracts under hand for the payment of money.

There is likewise no difficulty in determining the order of preference of the claim of Wilmington Trust Company, which is represented by two past due promissory notes of which it is the holder, both of which were protested and due notice thereof given to the said Raymond W. Ellis, one of which was made to the order of the said Raymond W. Ellis and negotiated by his endorsement, and the other to the order of the Wilmington Trust Company, payment of which was guaranteed in writing under the hand of the said Raymond W. Ellis. Both the endorsement and guarantee of the said Raymond W. Ellis are unquestionably "contracts under hand for the payment of money."

Apparently the claims of Eugene E. duPont resulted from loans. It does not appear that his claims are evidenced by any writing. Some of the respondents contend that the claimant is barred from pursuing his claims by reason of his failure to comply with the provisions of said *Section* 3861 of the *Code*. As above stated, the jurisdiction of this court in this proceeding is confined to the determination of the order of preference to be given to the demands of the respective claimants, and for that reason the contentions that the claimant is barred from pursuing his claim will not be considered. The claims, if enforceable, are undoubtedly within the classification of "other demands."

This brings me to the contentions concerning the claims of the Laird Estate and Henry B. duPont. For the purpose of establishing these claims written evidence was introduced.·

The claim of the Laird Estate is the result of four separate transactions.

The transaction of September 29, 1932, is evidenced by the following writing:

"September 29th, 1932.

"Mrs. Mary A. B. duPont Laird,
"Wilmington, Delaware

"My dear Mrs. Laird:

"In accordance with our conversation of yesterday I wish to acknowledge with much appreciation the loan of the following securities in order to provide capital for the new firm, with the understanding that said securities will be returned at the earliest possible moment.

1,000 shares McKeesport Tin Plate Co.
1,000 shares E. I. duPont deNemours & Co. Common
  300 shares Wilmington Trust Co.

"With sincere appreciation of your kindness, I am

"Very sincerely,

"(Signed)  R. W. Ellis."

The transaction of October 7, 1932, is evidenced by the following papers:

"Laird & Company
"duPont Bldg.
"Wilmington, Delaware

"October 7, 1932

"Dear Mrs. Laird:

"As the market has declined somewhat since you were good enough to loan me some securities to pledge as collateral in connection with the capital for the new firm, I am enclosing herewith a letter authorizing an additional loan of one thousand (1,000) shares of McKeesport Tin Plate stock temporarily.

"Thanking you very much, I am ·

"Very sincerely,

"(S)   R. W. Ellis

"Mrs. Wm. Winder Laird
"Wilmington, Delaware"

"October
Seventh
1932

"Laird and Company
"duPont Building
"Wilmington, Delaware
"Gentlemen:

"Will you kindly deliver to Mr. R. W. Ellis one thounsand (1000) shares of McKeesport Tin Plate stock from my special account, getting his receipt therefor.

"Yours very truly,

"(Signed)   M. A. B. duPont Laird"

"New York Office                          Members:
"39 Broadway                     New York Stock Exchange
"Philadelphia Office              New York Curb Exchange
"1606 'Walnut Street             Commodity Exchange, Inc.

"Received from Laird & Company
"duPont Building
"Wilmington, Delaware

"The following securities:

| Date | Quantity | Description | Total Amount |
|------|----------|-------------|--------------|
| 10/7/32 | 1000 | McKeesport Tin Plate | 21038/47 |

Delivered to

For

Signed   R. W. Ellis

Account
of     Mary A. B. duPont Laird

Kindly sign and return this receipt
Form 304"

The transactions of November 30, 1932, and February 4, 1933, are evidenced by the following papers:

"Accounting Record
Securities Delivered
Delivered to R. W. Ellis #3

Certificate Nos.

| Date | Quantity | Description | Total Amount |
|------|----------|-------------|--------------|
| 1·1-30-32 | 500 | McKeesport | |
| OK  R. W. Ellis | | | |
| | | For | |
| | | Account | |
| | | of | M. A. B. duPont Laird, |
| | | | Special |

Form 306 W"

"Accounting Record
Securities Delivered
Delivered to R. W. Ellis #3

Certificate Nos.

| Date | Quantity | Description | Total Amount |
|------|----------|-------------|--------------|
| 2/2/33 | 500 | McKeesport | |
| | | For | |
| | | Account | |
| | | of | M. A. B. duPont Laird, |
| OK. | | | Special |

Ellis
Form 306 W"

It was shown by uncontradicted testimony that the signatures "R. W. Ellis" and "Ellis" where they appear upon the papers are the signatures of the petitioner's testator.

The transaction with Henry B. duPont was evidenced by the following writing, signed by the said Raymond W. Ellis:

"Laird, Bissell & Meeds
"Investment Securities
"duPont Building
"Wilmington, Delaware

| "New York Offices | Philadelphia Office |
|-------------------|---------------------|
| Down Town | 1501 Walnut Street |
| 120 Broadway | Members |
| Up Town | New York Stock Exchange |
| 1775 Broadway | Philadelphia Stock Exchange |

"October 11, 1930
"Dear Belin:

"I beg to acknowledge receipt of five hundred shares of duPont Common Stock which has been placed in R. W. Ellis #3 account as collateral in the event of the account needing any additional collateral on any break.

"At the present writing this collateral is not needed, and as soon as the market stabilizes itself I will return same to you.

"Thanking you very much,

"Yours sincerely,

"(s)   R. W. Ellis

"Mr. H. B. duPont
"DuPont Building
"Wilmington
"Delaware"

With respect to the transactions of November 30, 1932, and February 4, 1933, which constitute a portion of the claim of the Laird Estate, there is no evidence showing the character of the transactions other than the two papers as above set forth, each of which shows that the said Raymond W. Ellis acknowledged in writing that there was delivered to him 500 McKeesport on account of M. A. B. duPont Laird Special. These papers were dated November 30, 1932, and February 2, 1933, respectively. Surely these papers show nothing more than an acknowledgment in writing by the decedent Ellis, in his lifetime, of the delivery to him for account of Mrs. Laird of the property therein mentioned. They do not show the assumption of any obligation in writing on the part of Ellis from which any conclusion can be drawn that either paper constituted a "contract under hand for the payment of money or the delivery of goods, wares or merchandise." As has been suggested, these papers may have been delivered in consummation of a sale, or as a gift, or as a loan. Clearly claims growing out of these two transactions must be included within the class of "Other demands." They will be excluded from what is hereafter said concerning the other transactions with Mrs. Laird.

It was first contended by the claimant, Wilmington Trust Company, that "Stock does not constitute goods, wares and [or] merchandise."

It would be interesting, were it deemed necessary, to discuss the cases in which the question as to whether corporate stock is or is not included within the meaning of these words.

This question was raised solely by the claimant, Wilmington Trust Company. It was not urged by any other claimant. It has been removed from the proceeding by the statement of counsel for Wilmington Trust Company that "This claimant by reason of the overwhelming weight of authority construing these words [goods, wares and merchandise] in the statute of frauds as including corporate stock, recedes from said position."

It was next contended by the claimant, Wilmington Trust Company, that "These were transactions of bailment and not of contract" and "There was no consideration sufficient to support a contract."

These contentions are closely related so they will be considered together. Counsel for the Wilmington Trust Company contended that the transactions simply amounted to loans of stock, that there is nothing to indicate that the decedent intended to pay anything for the use of the stock, and that the lenders were to receive any material benefit. In other words, that each of the transactions amounted to a gratuitous bailment, or what is known as a *"commodatum,"* and he refers to the case of *Coggs v. Bernard, 2 Lord Ray,* 909, in which Lord Holt defined *"commodatum"* as "a bailment of goods to be used by the bailee without charge."

Counsel for the Laird Estate and Henry B. duPont on the other hand contended that none of the transactions in question was a *"commodatum,"* but that the character of each transaction was a *"mutuum"* which as stated in *Sohm's Institutes of Roman Law, Section* 79, "arises where one person transfers a certain quantity of *res* fungibles * * * to another, this other (the transferee) becoming owner of the things subject to an obligation to restore the same

amount of the same quality as he had received." Attention was also directed to *The Institutes of Gaius, Inst.* 3, 14 *pr. Sec.* 2, where in reference to a loan for consumption it is said "Whence it is called *'Mutuum,'* because it is so given by me to you, that mine becomes yours."

In referring to the distinction between a *mutuum* and a *commodatum,* it is said in *Story on Bailments (3d Ed.) Sec.* 283, that:—

"We have already had occasion to notice the distinction between a *'mutuum'* and a *'commodatum.'* In the latter case no special property passes to the borrower. In the former case (a *mutuum*) the absolute property passes to the borrower, it being a loan for consumption, and he being bound to restore, not the same thing, but other things of the same kind."

From the language of the papers signed by Ellis it is apparent that the transactions of September 29, 1932, October 7, 1932, and October 11, 1930, were loans. The letter of September 29, 1932, acknowledged the "loan of securities to be returned." The letter of October 7, 1932, refers to a "prior loan of some securities" and enclosed a letter to be signed by Mrs. Laird authorizing an "additional loan of securities," and the letter of October 11, 1930, contained an acknowledgment of receipt of certain securities "to be returned."

It has been said that "A loan imports an obligation to pay back." *Omaha Nat'l. Bank v. Mutual Ben. Life Ins. Co., (C. C.)* 81 *F.* 935, 939. This of course is not open to dispute.

With respect to the manner of discharging a loan it has been stated "From the use of the term loan and its ordinary signification the law implies a promise to repay * * *. Except with respect to money a loan is returnable in specie, the specific thing or its equivalent in kind." 38 *C. J. Loan, Sec.* 6, *p.* 128.

There seems to be no question but that in transactions involving shares of stock the shares, as distinguished from

the certificates for the shares have been, for many years, uniformly treated and considered as fungible goods.

In the case of *Caswell v. Putnam, et al.,* 120 *N. Y.* 153, 24 *N. E.* 287, it was said:

"One share of stock is not different in kind or value from every other share of the same issue and company. They are unlike distinct articles of personal property which differ in kind and value, such as a horse, wagon, or harness. The stock has no ear-mark which distinguishes one share from another so as to give it any additional value or importance. Like grain of a uniform quality, one bushel is of the same kind and value as another. This doctrine appears to be well sustained by authority."

This language has been cited with approval by many courts, including the United States Supreme Court in the cases of *Richardson v. Shaw,* 209 *U. S.* 365, 28 *S. Ct.* 512, 52 *L. Ed.* 835, 14 *Ann. Cas.* 981, and *Duel v. Hollins,* 241 *U. S.* 523, 36 *S. Ct.* 615, 60 *L. Ed.* 1143.

In fact it has been said that,

"The rule that the identical property must be returned has never been held to apply to shares of stock." See *Christensen v. Pugh,* 84 *Utah* 440, 36 *P. 2d* 100, 104, 95 *A. L. R.* 608.

At the common law a *mutuum* was generally regarded as a sale. In 8 *C. J. S. Bailments,* § 10, *p.* 245, the following text is found:

"A *mutuum,* which is a loan of goods for consumption, goods of a like kind to be returned, was regarded by the Roman Law as a species of loan or bailment, but at common law this species of loan is not regarded as a bailment, but as a sale, for the reason that the specific property delivered is not to be returned."

Language to the same effect is found in *Hare on Contracts, p.* 64, and 4 *Elliott on Contracts, Sec.* 3007, *p.* 255.

The rule which treats a *mutuum* as a sale is subject to certain exceptions under which the transactions are regarded as bailments and not as sales, an example of which is grain deposited with a warehouseman which is commingled with grain of like quality belonging to other depositors, deliveries to be made from the common mass as called for

from time to time by the depositors. This exception is considered at length in an annotation in 54 *A. L. R.* 1166.

Another example is that relating to transactions involving the purchase and sale of securities by a broker for a customer. In such transactions the right of the broker to use as his own securities belonging to his customers is not generally recognized. The prevailing rule is that in business transactions concerning the purchase and sale of securities the relation of the broker to the customer is that of agent, or bailee, or trustee. See annotation in 52 *A. L. R.* 501.

The rule in case of grain deposited with a warehouseman is that a bailment is created by such a deposit, at least where the receiver keeps constantly on hand grain of the quality received, sufficient for delivery on call to all depositors, even though grain belonging to the warehouseman and various other owners is from time to time added to the common mass, and sales and deliveries are made therefrom, 6 *Am. Jur. Bailments, Sec.* 47, *p.* 177; and in case of a bailment of shares of stock the person in possession of the certificates may mingle them with others and satisfy his obligation by returning certificates of like kind, at least provided an equivalent amount of securities of the same description remain available, under his control, for delivery to the bailor. 6 *Am. Jur. Bailments, Sec.* 44, *p.* 175. It has been said however that as to grain the transaction is not changed by deficiency in amount of grain kept on hand, the view being that a contract to return bailed grain on demand implies a contract to keep on hand a sufficient supply. 6 *Am. Jur. Bailments, Sec.* 48, *p.* 179.

There is no suggestion that the transactions with Mrs. Laird and Henry B. duPont were commercial in their nature or that the rules recognized in mercantile business based on custom or usage in order to facilitate transactions dealing with fungible property has any application in these proceedings, nor has any evidence been introduced which would

warrant such a finding. The only inference that can be drawn from the evidence is that Ellis was receiving financial assistance from friends. From the papers signed by Ellis it is apparent that he was in need of money. The loan of September 29, 1932, was to be used by Ellis "in order to provide capital for the new firm," that of October 7, 1932, was to be used by Ellis to pledge "as collateral in connection with capital for the new firm," and that of October 11, 1930, was placed in an account of Ellis "as collateral in the event of the account needing any additional collateral on any break." What was loaned to Ellis and what was to be returned by him were shares of stock. It was, of course, not the understanding of the parties that the identical certificates which Ellis received were to be returned. It was necessary that the certificates be endorsed by the holders and delivered to Ellis so that he would acquire the same rights and control over the shares as if he were the absolute owner, otherwise he could not have used them for the purpose for which they were loaned. The loans were not for any definite period, in one case the understanding was the securities were to be returned "at the earliest possible moment," in another the loan was made "temporarily" and in the third the securities were to be returned "as soon as the market stabilizes itself." Those making the loans well knew at the time the loans were made that there would be a further transfer of the securities by Ellis, in connection with their use by him, and that there was the possibility of the sale of the shares to satisfy his obligations.

Under such circumstances it is not reasonable to assume that it was the understanding of the respective lenders that the loans were to be discharged by the return of the identical shares which were delivered to Ellis.

From the papers hereinabove set forth, signed by Ellis and admitted in evidence in support of the claims of the Laird Estate and Henry B. duPont, respectively, I am unable to arrive at any conclusion other than that it was not

the intention of the parties to the respective transactions that the identical shares of stock were to be returned, but that the stock was to be returned in kind, and for that reason, and therefore in accordance with the general rule, the transactions were contracts of sale, and the title of the respective shares of stock passed to Ellis.

The sole question remaining is whether or not the papers introduced in evidence, which were signed by Ellis, constitute "contracts under hand for the payment of money, or for the delivery of goods, wares or merchandise."

The determination of this question is in no way dependent on the form of the papers. Any writing, regardless of its form, whereby one over his signature for a consideration acknowledges a debt as owing to the person furnishing the consideration, whether the debt be payable in money or specific property, is sufficient to create a binding contract under hand for the payment of money or the delivery of goods, wares or merchandise, as the case may be, upon the delivery of the writing to the creditor or his authorized agent.

The paper of September 29, 1932, signed by Ellis, is an acknowledgment of a loan of securities to him by Mrs. Laird, to be returned at the earliest possible moment.

The papers of October 7, 1932, establish an additional loan of securities temporarily by Mrs. Laird to Ellis, evidenced by writings signed by him, which at the direction of Mrs. Laird were delivered to him for her account, and receipted for by him in writing, for her account.

The paper of October 11, 1930, signed by Ellis, is an acknowledgment of the receipt of securities by Ellis from Henry B. duPont, to be returned as soon as the market stabilizes itself.

With respect to each transaction as shown by the papers the unescapable conclusion is that the securities were delivered to Ellis either prior to or contemporaneously with

the written acknowledgment of their receipt and therefore, there was a sufficient consideration to support a promise for their return in the future.

Also with respect to each transaction Ellis obligates himself by a writing, signed by him, to return the securities loaned to the lenders. While the time for such return was indefinite, this is not material. Surely the respective demands made for a return after the death of Ellis to the executor of his estate, as shown by the evidence, were not premature.

It having been conceded by the claimant, Wilmington Trust Company, that shares of stock are goods, wares or merchandise, and no contention to the contrary having been made by any other claimant, my conclusion is that the papers dated September 29, 1932, and October 11, 1930, are each contracts under the hand of Ellis for the delivery of goods, wares and merchandise, and that the paper of October 7, 1932, signed by Ellis, addressed to Mrs. Laird, and the receipt in connection therewith, signed on the same day by Ellis, taken together constitute a contract under his hand for the delivery of goods, wares or merchandise.

In accordance with the above, my finding and determination is:

That the claims of Olive D. Ellis, guardian of Charles H. Ellis, Raymond W. Ellis, Jr., William L. Ellis, Wilmington Trust Company, and Glenden Land Company are respectively based upon contracts under hand for the payment of money, and therefore are within the eighth class in the order of paying debts of said decedent as prescribed by 3837, *Sec.* 39, of the *Revised Code of* 1935, such class being the ninth class as prescribed by said *Code* as amended by *Chapter* 191, *Vol.* 41, *Laws of Delaware,* approved May 19, 1937.

That the claim of Henry B. duPont, and that portion of the claim of Wilmington Trust Company, executor of

Mary A. B. duPont Laird, deceased, for the return of 1000 shares of McKeesport Tin Plate Company stock, 1000 shares of E. I. duPont de Nemours & Company stock, and 300 shares of Wilmington Trust Company stock, being the property described in the transaction of September 9, 1932, and 1000 shares of McKeesport Tin Plate Company stock, being the property described in the transaction of October 7, 1932, are respectively contracts under hand for the delivery of goods, wares and merchandise, and are therefore within the eighth class in the order of paying debts of said decedent, as prescribed by 3837, *Sec.* 39 of said *Code,* such class being the ninth class as prescribed by said *Code* as amended by said *Chapter* 191, *Vol.* 41, *Laws of Delaware.*

That the residue of said claim of Wilmington Trust Company, executor of Mary A. B. duPont Laird, deceased, for 500 shares of McKeesport Tin Plate Company stock, being the property described in the transaction of November 30, 1932, and 500 shares of McKeesport Tin Plate Company stock, being the property described in the transaction of February 4, 1933, and the claim of Eugene E. duPont, are within the class designated "Other demands" and are therefore within the ninth class in the order of paying debts of said decedent, as prescribed by 3837, *Sec.* 39 of said *Code,* such class being the tenth class as prescribed by said *Code,* as amended by *Chapter* 191, *Vol.* 41, *Laws of Delaware.*

An order will be made in accordance herewith.